South. 193, and held to be not well founded. We adhere to that ruling.

The judgment appealed from is accordingly affirmed.

━━━━━

(35 South. 967.)

No. 14,745.

AVERY v. SEGURA SUGAR CO., Limited.

(Nov. 16, 1903.)

CONTRACT—BREACH—DAMAGES—WAIVER.

1. The defendant company furnished money and supplies to the plaintiff to cultivate and make his crop of sugar and molasses, retaining a privilege and pledge upon the same. It also entered into a cane planter's contract with him. The contract provided that in the event of certain mishaps to the defendant the contract would be null and void. Mishaps did happen, but defendant elected then to keep it in force, and still assured plaintiff it would save his crop. When defendant announced to plaintiff that it had terminated the contract, it was impossible to obtain transportation elsewhere, and a portion of his cane was left standing in the field, and in windrow, and it was lost. It would have been a vain and useless act under the circumstances for plaintiff to have cut and hauled cane to the derrick on plaintiff's plantation for delivery to defendant, as the contract called for, and he was relieved from doing so. It was the duty of the defendant to have received delivery of the cane at plaintiff's station. He failed to do so, and is responsible for the loss on the cane left in the field, at the price fixed upon, less the amount to be allowed for expenses of the derrick and loading which was not incurred.

2. After defendant ascertained it could not well carry out its contract with plaintiff, it made arrangements with the Caffery Refinery to manufacture plaintiff's crop on certain conditions and a certain price, and a portion of the crop was sent there and manufactured. That refinery went into the hands of a receiver. The defendant intervened in the proceedings, claiming a vendor's privilege upon the sugar and molasses, but subsequently it discontinued the intervention, declaring it had been made in error. Plaintiff himself, reciting the facts, intervened, and claimed a privilege. In so doing he did not waive any rights he had against the defendant, nor adopt as his own the contract made by defendant with the Caffery Refinery.

(Syllabus by the Court.)

Appeal from Nineteenth Judicial District Court, Parish of Iberia; T. Don Foster, Judge.

Action by Daniel D. Avery against the Segura Sugar Company, Limited. Judgment for plaintiff, and defendant appeals. Modified and affirmed.

Mentz & Borah and Foster, Milling, Godchaux & Sanders, for appellant. Fenner, Henderson & Fenner and Burke & Burke, for appellee.

Statement of the Case.

NICHOLLS, C. J. Plaintiff prayed for judgment for the sum of $4,613, with interest.

He alleged that he was engaged in the cultivation of sugar cane on Avery's Island, and the defendant was engaged in operating a sugar refinery. That in February, 1901, he made a written contract with defendant for the sale and delivery to it, upon certain terms and conditions therein specified, of all his crop of sugar cane of the current year. That subsequently to the execution of said contract the same was supplemented and amended in the respect set forth in a letter of defendant to him written on or about the 9th of February, 1901.

That among other covenants and undertakings provided for in the said contract as supplemented and amended were the following:

First. That the defendant should purchase all of the cane grown by him on Avery's Island, at the price of 80 cents per ton for each cent that prime yellow clarified sugar should sell for during the week of delivery, the first official quotations of the New Orleans Sugar Exchange to be taken each day to make the average (this being the ordinary contract price for cane), and 20 cents additional in view of the admitted superior quality of petitioner's cane.

Second. That the cane so contracted for should be delivered by petitioner on cars to be furnished by the defendant at Avery's Island, the defendant expressly obligating itself to furnish to petitioner at Avery's Station a sufficient number of cars to deliver daily a fair proportion of his cane.

Third. That in the event the market price of cane should increase, and that defendant should pay to any other cane seller a price exceeding 80 cents to the ton as above set forth, petitioner should be entitled to same increase.

Petitioner annexed to his petition, as part of it, the original contract, and the letter of

the defendant supplementing and amending it.

Plaintiff averred that thereafter the defendant advanced the price of cane to $3.75 per ton fixed, to which advance price, as well as to the 20 cents per ton for the superior quality of his cane, he, under the terms of his contract with defendant, became entitled for his cane.

That in accordance with his contract he actually delivered to defendant, upon its cars at Avery Station, 1770 tons of cane, 487 $1700/2000$ tons of cane of which were shipped for the account of the defendant and at its request to the Caffery Sugar Refinery of the parish of St. Mary; that for said cane, in accordance with the contract, he was entitled to receive from the defendant the sum of $3.95 per ton ($1,927), but that defendant, of this indebtedness, refused to pay for the 487 $1700/2000$ tons which were shipped to the Caffery Refinery, and for which cane defendant owed him the sum of $1,927, and further that defendant refused to pay for one car of cane, containing 19 tons, shipped to the factory of defendant in Iberia parish, for which defendant was indebted to him $75.05.

Second. Plaintiff averred that although the defendant had expressly bound itself to receive and pay for all the cane grown by petitioner at the price stipulated in the contract, and to furnish him at Avery Station a sufficient number of cars to receive said cane, and although defendant was repeatedly put in default with respect to its said obligations, it utterly failed to comply therewith, and neglected and declined to furnish petitioner the necessary cars to enable him to deliver the whole of his crop, with the result that a large part thereof was lost; that the amount so lost, as the result of the failure on the part of the defendant to comply with his contract obligations, amounted to 24 $466/1000$ acres of standing cane, estimated at 15 tons per acre, for which, at the price fixed—$3.95—defendant owed him the sum of $1,449.61; and, further, 11 $24/100$ tons of windrowed cane, estimated at 26⅔ tons per acre, viz., 296 $75/100$ tons, at $3.95 per ton, for which defendant owed him additionally the sum of $1,162.08, which amount, under the terms of the contract, he would have received for the said cane so lost, if the defendant had complied with his contract.

Plaintiff filed, later, an amended petition, in which he averred that, as set forth in his original petition, he was entitled to an extra payment of 20 cents per ton over the price of $3.75 paid other cane sellers; that of the 1,770 tons of cane actually delivered by him, 1,282 tons and 300 pounds were delivered at the Segura Sugar Refinery, and, in the settlement made for said cane, this extra price was not paid, resulting in an indebtedness for the same, for this reason, of $256.43, which was still due to him.

That because of the delay on the part of the defendant company to furnish him with the necessary cars for the saving of his crop as agreed upon, petitioner was so delayed in the shipment of his cane that at least 766 tons of cane which would have been delivered to defendant, had it furnished the cars as agreed, were still in the field when a severe freeze occurred; that the cane, though unimpaired in so far as the manufacture of sugar was concerned, still was much affected as to its loss of weight, with the result that it lost weight at least one-third, occasioning him a loss of 255⅓ tons of cane weight, for which he was entitled to receive from defendant the price of $3.95 per ton, aggregating $1,008.

In view of the premises, he prayed additional judgment for the sum of $1,264.89, with interest.

Defendant answered, first pleading the general issue. It averred that it had paid plaintiff all that was due him for and on account of the matters set up, and that they had been settled for in full.

It averred that the plaintiff, by intervention filed for him in the United States Court for the Eastern District of Louisiana, in the suit in equity of A. H. Morris v. The Caffery Central Sugar Refinery and Railroad Co., Ltd., had claimed the price of 487 tons, 1,700 pounds, of cane, averring that it was sold by him to said defendant corporation therein, and claiming the lien and privilege of the vendor under the statutes of Louisiana as affecting the product of sugar molasses and syrup of all cane ground during the last past rolling season by said defendant corporation, and that said cane was part of the very

cane the price of which plaintiff was presently demanding in his suit; that plaintiff was estopped by his judicial plea in said intervention from demanding the price of said cane from it, the Segura Sugar Refinery Company, Limited; and it specially pleaded said estoppel in bar of such demand.

Defendant filed, later, an amended answer. It admitted it signed the contract of February 1, but denied that the construction placed upon it by plaintiff was correct. It averred that, when the settlement was made for the cane as described in plaintiff's amended petition, it had a full and final settlement with plaintiff for all cane actually delivered, and paid all amounts claimed to be due, and no further amount was claimed or demand made at the time of said settlement, but said plaintiff accepted said settlement and payment as full and final settlement of all cane that had been delivered to defendant's factory, and that the plaintiff was now bound by said settlement, and was estopped from claiming anything further on account of said cause of action as set forth in his amended petition, which estoppel defendant especially pleaded.

Further answering, it showed that it was stipulated in said contract that the manufacture of said cane into sugar at the aforesaid sugar house being a material consideration of this contract, it was expressly stipulated and agreed in the event of fire, breakage of machinery, or any other cause beyond the control of the party of the first part, but of such a nature as to prevent for more than six consecutive days the manufacture of said cane into sugar at the aforesaid sugar house, this contract was to become null and void for all cane not previously delivered at the said sugar house. Should, however, the said mill operations be stopped but for a few days owing to any cause, this contract shall continue in full force, but the said party of the second part agrees not to hold said party of the first part in any manner responsible for any loss which may be incurred owing to the nonreception of cane by the party of the first part during the said time stipulated.

That on or about the 30th of November, 1901, during the time that it was operating its mill and refinery to its utmost capacity, for the purpose of complying with its contracts with said plaintiff and all other persons with whom it had contracted, there occurred a very severe breakdown of the machinery of defendant, and it was unable to run the machinery or grind any cane, or manufacture any sugar for more than 10 days from the date of said breakdown. That under the terms and conditions of the contract, said breakdown of the machinery—which breakdown was beyond the control of defendant, and a circumstance over which it had no control—the contract of the plaintiff was rendered null and void and of no effect whatever.

That after this condition, which dissolved the contract, happened, there was no contract whatever existing between the plaintiff and defendant for the delivery or the price of the cane, and it was in no manner bound, under the terms of the contract attached to plaintiff's petition, for the cause above set forth.

It further showed that, while it was not bound under the terms of said contract after the breakdown as aforesaid, it did what was in its power to assist the various parties with whom it had contracted to market their cane, and when the machinery of defendant was repaired it purchased the cane of the parties with whom it had originally contracted, in preference to other parties who were in the market as the vendors of cane.

That after the breakage of the machinery of defendant as aforesaid, and after it had resumed operations, there occurred another breakage of machinery of defendant in the early part of January, 1902, which totally suspended operations of the factory of defendant for several days, and, the season being so far advanced, defendant saw that it would not be able to completely repair machinery in time to do any further grinding during that season, so it discontinued the use of the broken crusher and made direct connection with the mill, which reduced its milling capacity to about one-third thereof that which it originally had.

That the capacity of the said mill being thus reduced, this condition of affairs existing, and defendant saw there was no chance to remedy same, it immediately notified the plaintiff that it could not grind any more cane for him.

It further showed that, notwithstanding the fact that it was under no obligations to

plaintiff to purchase from him the cane grown by him during the year 1901, it nevertheless assisted plaintiff in finding a purchaser for his cane, without charges:

Defendant further showed that, even after the breakdown of November 30th had been repaired, had this second breakage of its machinery not occurred, while it was in no manner obligated under the contract, after the first breakdown as aforesaid, to take the cane of the said defendant under said contract, it would nevertheless have been able to grind all the cane of said plaintiff, and little or no loss would have occurred on account of the freeze.

It prayed the plaintiff's demand be rejected. The district court rendered judgment against defendant in favor of the plaintiff for:

(1) The sum of $1,977, being the price due for $487\,^{1700}/_{2000}$ tons, subject to a credit of $1,370.23 received on said indebtednesses.

(2) The sum of $75, being for 19 tons rejected by defendant.

(3) The sum of $2,115.58 being for 24-$^{466}/_{1000}$ acres of standing cane and 11-$^{24}/_{100}$ acres of windrowed cane.

(4) The sum of $1,008.46, being the estimated loss in the weight of cane delivered to the defendant.

It decreed that defendant pay legal interest from February 13, 1902, and all costs of court to be taxed.

Defendant appealed.

Plaintiff answered the appeal, praying that the judgment be increased to $4,378.12, with legal interest from February 13th, and costs.

The exhibits annexed to the plaintiff's petition are: (1) The alleged original contract between him and defendant, an instrument sous seing privé, signed by the Segura Company Limited, S. O. Nuckolls, and Daniel D. Avery; (2) a letter from plaintiff to defendant on the subject; and (3) the reply thereto. The first purports to have been signed by both parties on 1st February, 1901, but such was not the fact. It was signed by Nuckolls for the defendant company on that day, and left for the signature of the plaintiff. It reads as follows:

"Cane Contract.

"The Segura Sugar Company, Ltd., located in the Parish of Iberia, La., on the Segura

Plantation, party of the first part, and D. D. Avery, party of the second part, have entered into the following agreement:

"Said party of the second part, owner of cane crop now growing on Avery's Island, situated in the Parish of Iberia, State of Louisiana, agrees to sell and does hereby sell unto party of the first part the said cane crop, consisting of about 3,000 tons intended for the mill.

"Said party of the second part binds himself to deliver at f. o. b. Avery Station all said cane, which shall be sound, unfrozen cane, free from leaves, trash and dirt. The tops to be cut in the first solid red joint below the white.

"The delivery of said cane is to start on a date to be specified by the party of the first part, but which shall be no later than the 1st day of November next, to be completed no later than the 15th day of January following, and shall be considered as made on the arrival of said cane at the sugar house scales belonging to the party of the first part.

"It is mutually agreed that the daily delivery of said cane shall not exceed a certain number of tons, nor be less than a certain other number of tons, which said number of tons shall be determined by the parties of the first part, but which shall be proportionate to the total tonnage of cane to be received during the twenty-four hours from all sources at the factory of the parties of the first part, all conditions and weather permitting.

"In consideration of which the party of the first 'part agrees to pay unto the party of the second part for all cane so delivered, said cane to be weighed on the scales at Avery's Island, twenty cts. per ton, and the sum of 0.80 per ton of 2000 lbs. for each cent that the prime yellow clarified sugar sells for during the week of delivery, first official quotations of the New Orleans Sugar Exchange to be taken each day to make the average, which price shall constitute the price of this contract.

"The manufacture of said cane into sugar at the aforesaid sugar house being a material consideration of this contract, it is expressly stipulated and agreed that in the event of fire, breakage of machinery, or any other cause beyond the control of said party of the

first part, but of such a nature as to prevent for more than six consecutive days the manufacture of said cane into sugar at the aforesaid sugar house, this contract to become null and void for all cane not previously delivered at the said sugar house. Should however the mill operations be stopped for a few days owing to any cause this contract to continue in full force, but the said party of the second part agrees not to hold said party of the first part in any manner responsible for any loss which may be incurred to the party of the second part owing to the non-reception of cane by the party of the first part during the said time of stoppage.

"Settlement to be made on every Thursday for all cane delivered up to the end of the preceding week.

"And whereas said party of the second part having declared that he would need an advance to the extent of ($1000.00) One Thousand Dollars in cash and supplies to enable him to cultivate the aforesaid crop; and whereas parties of the first part do hereby agree to make unto party of the second part the said advance of one thousand dollars in cash: Now, therefore, said party of the second part, as a security for the reimbursement of said advances, together with interest on same at the rate of 5 per cent. per annum from date until reimbursed, does hereby pledge and pawn unto parties of the first part the entire crop being now raised on lands and hereby recognized in favor of parties of the first part all the liens and privileges granted by law to the furnishers of money, provisions and supplies, it being agreed that parties of the first part shall be reimbursed out of the first proceeds of the cane crop.

"Thus agreed to and signed in duplicate in the presence of the undersigned competent witnesses this 1st day of February, 1901, at Segura."

The plaintiff signed this instrument, but accompanied it with the following letter.

"February 7th 1901.

"Dear Sam: I owe you an apology for not sending you the signed contract before this. I was in town Saturday, but was unable to find you Saturday evening or Sunday morning. About the contract:

"1st. There is nothing said about more advances. 2nd. There is nothing as to the number of cars I am to have per day. I want cars for 80 tons. 3rd. Nothing is said about my getting 25 cents in case the R. R. Co. should reduce the rate to 25 per ton from here. 4th. There is nothing in contract about my being protected against any advances in price as was promised me.

"I herewith return signed contract but with the distinct understanding that I am to be protected as above enumerated and am to have a letter from Segura and Co. to that effect. If there should be any more in this the deal as I am concerned is off and I will return you your $1000.00.

"I dont want you to think I am doubting your promise for I am not, but this is a matter of business and should anything unforeseen appear to you, I might be put in a hole and this is what I want to avoid.

"Sincerely yours,   Dan D. Avery."

The following reply was made to the communication:

"Segura Co. Ltd.

"Segura La. Feb. 9th, 1901.

"Mr. D. D. Avery, Avery La.—Dear Sir: We have received your favor of the 7th inst, inclosing contract duly signed with reference to the clause in contract which you wished inserted. We desire to state that we will arrange these matters to your satisfaction.

"1st. We will make you advances to the extent of $4000.00 if you require that amount.

"2nd. We will furnish you cars to keep your force going just as we have always done.

"3rd. In case there is a reduction in freight on cane from Averys to Segura, same will revert to you.

"4th. We will protect you against any advance in market price of cane.

"Trusting that this will be satisfactory we remain with best wishes.

"Yours very truly, Segura Sugar Co., Ltd.,

"S. O. Nuckolls."

The defendant advanced to the plaintiff during this season $4,000 as agreed upon.

The plaintiff commenced cutting cane and hauling to Avery Station for the defendant on November 1, 1901. The delivery of the cane was to be made by plaintiff at Avery Station, and defendant undertook itself to

furnish cars and take the cane from the station to the factory of the defendant.

On the 30th of November the crusher of the defendant's factory broke, and on the same day the defendant company sent out the following notice to different parties with whom it had contracts:

"Dear Sir: This is to advise you that we just had a very serious breakdown. We expect to resume in several days. In meanwhile you are privileged to make outside deliveries.

"The Segura Sugar Co.,
"Per Emile Delassus."

The plaintiff testified that he received neither this notice nor any other notice of this breakdown from the defendant; that he heard of the fact casually from an outsider some days after it occurred, but did not know of its extent. That he acquired the first actual direct knowledge of it on the 12th of December, when he made a visit to defendant's factory.

The breakdown caused defendant to suspend the making of sugar until December 11th. On that day operations were resumed and continued up to January 3, 1902, when the crusher broke a second time.

On the 4th of December, 1901, a freeze occurred, which very generally split the cane.

On the 3d of January, 1902, defendant wrote to the plaintiff that they had just met with another great disaster—that it had broken another crusher, and it would require 8 or 10 days to fix it up again. That they were endeavoring to fix up with another factory which was about to finish up; that if plaintiff could arrange to work out his crop without depending upon this arrangement which they were about to make with this outside refinery, why, to do so, as it was imperative that all cane left in the field should be hauled at once.

On January 4, 1902, the defendant, replying to a letter from plaintiff of the 2d of January, which is not in the record, said that they acknowledged the receipt of that letter; that he was in error when he stated that the delay in getting out his crop was due to the lack of cars furnished by them; that they did know he was late in making a start due to a shortage of labor, and, besides, after he did start, he only loaded one or two cars per day; that, to help him out during their "shutdown" of nine days due to the crusher

break, they handled through Cypremort Factory some of his cane; that when they broke down they advised him immediately of same, and informed him that he could make outside deliveries to protect his crop; that it appeared he did not take steps to ship cane to outsiders, besides the very few cars that went to Cypremort; that they had advised him two days before of their crusher breakdown, and the writer had a few minutes before told him over the phone that they could not possibly save his crop since this last breakdown; that they had advised him, and again advised him, that whereas they would do all they could for him, it was absolutely necessary that he get some of the outside refineries to help him out; that they had stated to him that they would phone him that afternoon if Caffery Refinery could assist him.

Plaintiff, replying on the next day, said that "his entire crop was not only sold to them, but also pledged to cover certain advances which they had made; that his cane was all in windrow, and he would look to defendant to save same; that his cane was at its risk, and subject to its orders."

On December 30, 1901, defendant company had written to plaintiff that they were sorry to report that they had received two cars of cane from him which was in a sour condition; that he would please have all sour parts cut off in future; that if he shipped another car of sour cane they would have to understand that plaintiff had only sour cane, and plaintiff would force them to reject his entire crop; that it was therefore to be understood that he should load and ship to them only sound cane; that they hoped he would not force them to reject his entire crop.

Plaintiff replied on the 2d of January, 1902, saying that he was not shipping, nor had shipped, any but sound cane; that he had been most careful in this matter, and was continually in the field with his cutters examining the cane as it was cut, and had had it examined by more than half a dozen responsible people before it had left his switch; that while at defendant's factory on the 31st of December, 1901, he had suggested to Mr. Burguiere, defendant's president, that they should agree upon a reliable planter to go to his place and inspect all of his cane then in windrow, and he had declined, saying that all

he wanted was sound cane; that he (plaintiff) had had his cane inspected the day before he was writing, and at his request the party so inspecting had written him the condition in which he found it; that defendant would recollect that prior to the recent freeze he had an offer from the Adeline Sugar Company to purchase his entire crop; that he had communicated this fact to them, and, after their positive assurance that they would save his entire crop, he had declined to sell to them.

That he would still further call to defendant's attention that on the 27th of December, 1901, defendant had telephoned him asking him how much cane he still had in the field, and he had replied saying that he had 1,500 tons or more, and that they stated that should Segura be forced to close before his crop could be saved, they would see that the balance of his crop should be taken care of by the Cypremort Factory. Proceeding, he wrote that whether they ground or rejected his cane was a matter for them to decide, but he would state in the most positive manner that he would hold them responsible for any loss their action in the premises might occasion him; that it was a matter of notorious record in the community what their car service had been during the present grinding season, and he would hold that the present condition of his crop was owing to the inadequate car service on their part.

On the 5th of January, 1902, defendant wrote to plaintiff that they had called his attention to the fact that they had persuaded the Caffery Refinery, on account of their breakdown, to help plaintiff out; that they would only do so on certain conditions; that they furnish him four to five cars per day, plaintiff to load them with only sound cane i. e., all sour parts removed from said cane; that said refinery would pay him 80 cents per ton, and allow 50 cents per ton to cover freight and other charges.

They further wrote that, as their own breakdown had disabled them to such an extent that they knew they could not save his crop, they advised him for his own protection to accept the Caffery Factory proposition, which was submitted to him through them, the defendant company; that they believed they had done more than their part when they got the Caffery Refinery to make him this offer; that thus they saw the matter then. Plaintiff was in a position to save his crop through the Caffery Refinery, and it was now left to plaintiff to do so. On the following day defendant wrote again to the plaintiff saying that the Caffery Refinery was sending him cars; that they had written him that on account of their breakdown they were forced to cancel their present contract; in other words, that it was absolutely impossible for them to save his crop since their breakdown; that they wished, therefore, plaintiff to understand the situation, that he might look to outsiders to save himself; that they considered they were very fortunate in inducing the Caffery Refinery to ship him cars, and the price which they stated they were willing to pay was 80 cents, with an allowance of 50 cents to cover freight and other charges; that they had instructed (as they had arranged with Caffery for plaintiff's individual benefit) that they made return directly to the plaintiff; that of course plaintiff would understand that there was some balance due them for advances made on his crop, and they would look to him to understand that, notwithstanding the fact that plaintiff was getting assistance from Caffery Refinery, they (the defendants) would, on the other hand, do all they could to help him out; in other words, they proposed to send him all the cars they could in the same proportion that they were sending to all their other friends, and in this way he would get the benefit of the increased price on all cane delivered and accepted at Segura which defendants paid him; that it was only with a view of seeing that plaintiff lose none of his crop at all, and knowing that he would lose a great portion of his crop if he depended on Segura since the breakdown, that they had put him in a position to work off some of his crop with the Caffery Factory; in other words, from plaintiff's own standpoint it was better to lose a little on the price of the cane rather than to lose his entire crop on account of said breakdown, and they wished him to distinctly understand that they were not in any way responsible, since their breakdown, for plaintiff's crop; that they had explained this repeatedly to plaintiff, and were doing so again, and it was now up to plain-

tiff to make the deliveries to the Caffery Factory, as they were the only people who could give him cars.

That they would recommend to him that he be exceedingly particular in making his deliveries to the Caffery Factory, as well "as deliveries which you make to Segura, as we expect to send you cars whenever we can, and in the same proportion that we send to other friends; and send only cane which is free from sour parts. The Caffery Factory is as particular as the Segura Refinery, and if they get any cane which has not been freed from the sour parts they might refuse to handle any more of it"; that they mentioned this for plaintiff's own protection.

On January 9th, defendant wrote plaintiff that they had advised him of the price which the Caffery Refinery would give him for his cane before it placed cars at his switch; that the fact that plaintiff filled those cars signified that he accepted the price of 80 cents and 50 cents per ton to cover other charges; that they explained the situation to him thoroughly; that he accepted the conditions by loading the Caffery cars, and he would therefore distinctly understand that they would not entertain any claim for difference in price for cane already delivered to Caffery, and cane to be delivered to them; that, as they had stated before, they would ship him cars as often as they could, but at the same time could not save his crop on account of their very reduced capacity due to their breakdown; that they sent him two cars that day, and would send him more as soon as they could.

On the 22d of January plaintiff wrote defendant that in compliance with their request he had telephoned to them the day before the net amount of cars of cane shipped for defendant's account by him to the Caffery Central Factory at Franklin, and he in his letter begged to confirm the same.

He accordingly made out a statement of these cars by dates and numbers. He added that he called defendant's attention to the fact that he had mailed them B/L and daily reports to cover these shipments for the first four days, but as they had returned the same to him he ceased doing so. That he made formal demand upon defendant to remove the cane then windrowed and standing in his field, as same had to be removed at once for

him to proceed with the cultivation of his new crop, and that unless he heard from them in that matter he would within three days have the same removed at their expense.

The evidence shows that between 487 and 488 tons of cane were shipped to the Caffery Company; that plaintiff, out of his crop of 1901, lost between 24 and 25 acres of cane standing in the field, estimated at 15 tons per acre, and between 11 and 12 acres of windrowed cane, estimated also at 15 tons per acre.

The Caffery Refinery Company was, on petition of A. H. Morris, placed, by the Circuit Court of the United States for the Eastern District of Louisiana, in the hands of a receiver. On the 22d of January, 1902, the Segura Company intervened in that proceeding, praying for a judgment recognizing and decreeing it to have a privilege and right of precedence upon all the sugar, syrup, and molasses, manufactured or unmanufactured, belonging to or in possession of the Caffery Refinery, to secure the payment to it of the sum of $4,350 due for the sale of cane to it as stated in its petition, and condemning it to pay to intervener said amount, with legal interest, secured, as to payment, by privilege. It was alleged in the petition of intervention that during the week ending January 11, 1902, it had sold to the Caffery Refinery 292 tons and 1,240 pounds of sugar cane, worth, at the price agreed on between them, the sum of $830.31, and during the week ending January 18th it sold to it 195 tons and 460 pounds of sugar cane, worth, at the price agreed on between them, the sum of $539.32, both of said shipments being made from cane grown by Daniel D. Avery of Avery's Island. That the Caffery Refinery owed it said amount. On February 8th the defendant, on prayer made by it to that effect on that day in a petition, was allowed to withdraw from its petition of intervention so much of the claim in intervention as concerned its claim for cane grown by Daniel D. Avery.

On the 29th of March, 1902, the present plaintiff intervened in the same case. In his petition he alleged that he was a cane grower in the parish of Iberia; that he had made a written contract with the Segura Company for the sale and delivery to it, upon specified

terms and conditions, of all of his crop of cane of the year 1901, and thereafter, in accordance with said contract, he delivered to the company and received a portion of his crop of cane; that before the crop was all delivered, however, the Segura Company informed him that it would be unable to receive any further delivery of cane from him; that thereafter it notified him that it had arranged with the Caffery Refinery Company to purchase the balance of petitioner's crop upon agreed terms and conditions, and that it, the Segura Company, would furnish him the cars necessary to effect the delivery of said crop to the Caffery Company; that thereafter the Segura Company did furnish the said cars, which were loaded by him with cane and delivered to and received by the Caffery Company, and by it in due course of business ground and converted into sugar; that at the time the said cane was so delivered to the Caffery Company he understood it was being delivered for account of the Segura Company, which was obliged to purchase of all his cane under its contract with him; that thereafter the Segura Company, in confirmation of his understanding, had filed an intervention in that court and proceeding, in which it claimed to be the owner of the cane so delivered by him, and to be entitled to receive the purchase price thereof, but thereafter, on the 8th of February, it set up that the allegations of their petition of intervention, in so far as they applied to the cane delivered from his place, were made in error; that in truth and in fact it was not the owner of said cane, and that it desired to discontinue its intervention so originally filed, leave to do which was granted; that he, to minimize as far as possible the damages which have resulted to him from the breach by the defendant of its contract to purchase and receive his cane, desired to intervene and claim the purchase price of the said cane, and the benefit of the lien and privilege to secure the said purchase price granted by the statutes of the state; that the cane so delivered to the Caffery Company, during the week ending January 11, 1902, amounted to 292 tons and 1,240 pounds, the agreed price of which was $830.31, and that the cane delivered to it during the week ending January 18th amounted to 195 tons and 460 pounds, the agreed purchase price of which was $539.92, the whole of which purchase price was due and owing by the Caffery Company.

In view of the premises it prayed for judgment recognizing him as creditor of the Caffery Corporation in the sum of $1,370.23, with recognition of his lien and privileges, for payment of said sum, upon the proceeds of the sale of the syrup, sugar, and molasses manufactured during the season by that corporation.

The plaintiff obtained a judgment upon that intervention, under which he received, since the filing of his suit, the sum of $1,370.23, for which defendant is given credit on that branch of the case.

### Opinion.

Defendant's contention that the contract between the parties was annulled ipso facto by the first breaking down of the machinery is not well founded. In the first place, the clause in it to that effect was simply a privilege which defendant had the right to take advantage of if it thought it to its interest so to do, or to decline if it thought otherwise. The contract shows this on its face, for it contemplated and provided for a subsequent continuance of the operations. Defendant, so far from desiring contract relations between himself to be broken off, and so announcing to plaintiff, declined to authorize him to accept an offer which had been made to him by the Adeline Refinery to purchase his entire crop. Besides this, the defendant, in its letter to plaintiff of the 5th of January, informed him that on account of the last breaking of their machinery they had been disabled to such an extent that they knew they could not save his crop; that he was then in a position to save the same through the Caffery Refinery, and it was then left him to do so; and in a letter written the following day (the 6th of January) they stated that they had written him from Segura, the day before, "that on account of their breakdown they were forced to cancel their present contract." This declaration was the first made to the plaintiff by defendants that they considered the contractual relations had come to an end, and it was inconsistent with their claim and present contention that they had been terminated by the breaking of the machinery on the 30th of November, 1901.

Defendant did not notify plaintiff just after the first break, as they did others of their customers, that they were at liberty thenceforth to make other arrangements, for the reason that plaintiff was heavily indebted to them for advances upon the crop, and their rights might be seriously endangered by following this particular course with him. Defendants had evidently seen the difficulties of their position, and were endeavoring to free themselves from their contract liabilities and yet retain its benefits. They were obviously seeking, through arrangements made with the Caffery Refinery, to lighten the load with which they were burdened, just as they had done a little while before through arrangements made with the Cypremort Refinery. The plaintiff had not authorized them to do this, and, although they declared to him that in making these arrangements they had been acting for his protection and in his interest individually, that declaration by no means proved itself. They were not justified in making contract arrangements for the plaintiff so as to relieve themselves of their responsibility. We think the allegations of their petition of intervention disclosed the true condition of affairs, and they could not, by withdrawing the intervention upon the claim of error, particularly after allowing the intervention to stand as long as it did, prejudice the plaintiff's rights. We think the district judge reached a correct conclusion in ruling that plaintiff by his own subsequent intervention did not estop himself from urging any claims against the defendant, which, but for this, they could have legally advanced against them.

Plaintiff did not claim in this intervention that defendants had acted in the matter as his agent, nor that he himself occupied the position towards the Caffery Refinery of a vendor of the cane. He had had a vendor's privilege upon the cane, and he claimed the right to enforce the same upon its product, defendant's action to the contrary notwithstanding. He set out the exact facts of the case in his petition. He was not forced to sit idly by and see his interests abandoned in the premises by the defendant company, and his conduct had the effect of minimizing the damage which the defendant would have otherwise suffered. The district judge was of opinion that plaintiff had made good his claim to an additional amount of 20 cents per ton upon the price to be paid by defendant for his cane, over and above that which was to be paid by the defendants to other producers on account of its supposed superiority over theirs.

In declaring the price to be paid plaintiff for the cane, there is an unexplained reference to 20 cents in addition to 80 cents. We think plaintiff was entitled to explain what this 20 cents had reference to. Plaintiff having made the explanation, and shown that defendant had engaged to protect him in case of increase of price of cane to other producers, we see no reason why this 20 cents should not accompany the increase in each ton. We would have had some difficulty in understanding the 35 cents which we find accorded to plaintiff in the various statements which defendants made out, and which they furnished to plaintiff weekly, showing their relative positions. Plaintiff testified to the fact that defendant had two sets of customers, those who used their own derricks and loaded them and weighed their own cane, and those who did not; that the former class were allowed 20 cents per ton for derrick and loading expenses, and that he was placed on this footing, as he owned his own derrick and did his own loading; he explained the other 10 cents of the 35 cents referred to by saying that the defendant admitted he was entitled to 10 cents additional on the price of his cane, but contested owing more, and this matter was postponed for later discussion. There was evidently some reason for this admitted charge of 10 cents. The defendant does not attempt to explain matters, while plaintiff does. Defendant's effort seems to have been more directed to excluding testimony than to contradicting or disputing it when admitted.

We cannot say the district court erred in adopting plaintiff's explanation of this matter.

The plaintiff's rights between himself and the defendant in regard to the cane shipped to the Caffery Refinery are to be tested by their own contract, and not by that between him and the defendant. The district court does not err in decreeing plaintiff to recover from the defendant "the sum of one thousand nine hundred and seventy-seven dollars, being the price due for 487 $1700/2000$ tons, sub-

ject to a credit of $1,370.23 received on said indebtedness."

We see no good ground for altering the judgment of the district court in favor of plaintiff against defendant for $75, being for 19 tons rejected by defendant.

We next direct our attention to that portion of the judgment appealed from placed by the district court under the No. 3, for the sum of $2,115.58, being for 24 $466/1000$ acres of standing cane and 11 $24/100$ acres of windrowed cane.

The court below estimated the tonnage per acre of both standing and windrowed cane at 15 tons per acre. Plaintiff urges that this estimate was too small, while defendant maintains that it owes plaintiff nothing on this score. We do not feel warranted in increasing this estimate made by the district court of the tonnage, but we do not think plaintiff is entitled to claim 20 cents per ton upon the cane left standing in the field and in windrow which was lost; that amount was accorded to plaintiff to cover derrick and loading charges, which were not incurred by him as to this particular cane. Twenty cents per ton upon this particular cane must be deducted from the amount decreed to the plaintiff under this item.

The cane the price of which is covered by this portion of the judgment formed part of plaintiff's crop of 1901, but it was never weighed, nor did it ever pass into the possession of the defendant corporation. A part of it was left standing in the field, and a part of it was left in windrow in the field, and the whole of it was lost.

The defendant in its answers makes charges of no kind against the plaintiff in respect to full compliance by him of his obligations under the contract declared upon.

It defends under the general issue, and upon the ground that it was released from its obligations by the terms of the contract, which provided for the legal consequences to result from the breaking of its machinery.

It insists that breaks occurred which released it from liability in the premises. We have already had occasion to discuss to some extent that proposition. Defendant insists in its pleadings that, "while it was not bound under the terms of its contract, after the breakdown, it did what was in its power to assist the various parties with whom it had contracted to market their cane, and when its machinery was repaired it purchased the cane of the parties with whom it had originally contracted, in preference to other parties who were in the market as vendors of cane," but we do not find this position tenable.

The original contract between the plaintiff and the defendant was not terminated by the first breakdown, and the relations between them continued until he could no longer obtain transportation from other sources. We think, under the evidence, that plaintiff did all that he was called upon, as vendor, to do under the circumstances. The testimony shows that the defendant, though frequently called upon, was greatly behind from the beginning in furnishing cars at Avery Station, as was his affirmative duty as vendee.

It was no part of plaintiff's obligations or duty to transport the cane to the Segura Factory. It was defendant's duty to accept delivery at Avery's, and complete the same itself at the refinery. If it did not choose to do this, or was not in a condition to do so, it could not throw the resulting loss on the plaintiff; the plaintiff had the right to consider the contract fully performed so far as he was concerned, and to claim the promised price—he claims no more than this in this action. It is true a part of the cane was left standing in the field, but this was because defendant failed to call for it, as vendee. It would have been a worse than useless act to have cut the standing, and taken up the windrowed, cane, and hauled them for no purpose to the station, at great expense, and to no profit to any one. It is true that this cane was not weighed, but its weight could be ascertained with reasonable certainty, and this was done. The plaintiff, in view of defendant's course, was entitled to be placed in the same position which he would have occupied had defendant complied with his own obligations. There is no question in this case of paying the plaintiff damages.

Defendant urges that the district court erred in the estimate placed by it upon the loss in the weight of cane. While we are inclined to think the estimate high, we cannot say the court erred.

For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from be, and it is hereby,

amended, by reducing the amount accorded to the plaintiff under the item No. 3 from $2.115.50 to $2,009.58, and, as so amended, the judgment is affirmed, at costs of appellee.

### On Application for Rehearing.

#### (Feb. 29, 1904.)

PER CURIAM. The decree in this case is modified so as to leave open the claim of defendant to a deduction of $1 per ton in addition to the 20 cents per ton already deducted from the $2,115.50 allowed for cane standing in the field and windrowed, under item 3 of the petition, and the case is remanded for further evidence and adjudication on this point, the question being as to whether the nondelivery of this cane resulted in any saving to plaintiff.

With this modification of the judgment, the rehearing is refused.